UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ROBERT ROSE,

                    Petitioner,

        -against-

ELIOT SPITZER, New York State Attorney
General, and DANIEL SENKOWSKI,
Superintendent, Clinton Correctional Facility,

                    Respondents.
-------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    JUN 2 2 2006

P.M. ____
TIME A.M. ____

**MEMORANDUM and ORDER**

99-CV-6053 (SLT)

**TOWNES, United States District Judge:**

       Petitioner Robert Rose, an African-American, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his June 1995 conviction for murder and a related weapons offense on the ground that the State court improperly rejected his argument that the prosecution's allegedly discriminatory use of peremptory challenges violated his constitutional rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). On February 26, 2004, after this Court determined that the State court had failed to comply with *Batson* by failing to determine whether the prosecutor's reasons for exercising the challenges were pretextual, Magistrate Judge Cheryl L. Pollak ("Judge Pollak") conducted a reconstruction hearing to determine the prosecutor's rationale for exercising the peremptory challenges at issue. Judge Pollak credited the race-neutral reasons offered by the prosecutor at that hearing and, in a Supplemental Report and Recommendation dated July 25, 2005 (the "Supplemental R&R"), recommended that the petition for a writ of habeas corpus be denied.

       Petitioner timely filed objections to the Supplemental R&R. Pursuant to 28 U.S.C. § 636(b)(1), this Court has reviewed de novo those portions of the Supplemental R&R to which petitioner has objected. For the reasons set forth below, this Court accepts the Supplemental R&R in its entirety and denies the instant petition for a writ of habeas corpus.

## BACKGROUND

On July 23, 1992, petitioner – then 19 years old – shot and killed one Coleman Scurlock, a New York City Transit employee, near the Queens Village home petitioner shared with his mother. Shortly after the incident, petitioner gave police a statement in which he admitted shooting Scurlock, but claimed to have done so in self-defense after finding Scurlock, whom he claimed not to know, standing on the stoop of petitioner's home with a gun. During the course of investigating the crime, however, the police and prosecution learned that Scurlock had not been a stranger to petitioner, but had been involved in a long and tumultuous relationship with petitioner's mother and had beaten petitioner's mother shortly before the July 23 shooting.

Sometime in 1992, petitioner was indicted for murder in the second degree under an intentional homicide theory, *see* New York Penal Law § 125.25(1), and related weapon offenses. In April 1995, petitioner went to trial on those charges before the Honorable Pearl B. Corrado ("Justice Corrado") in the Supreme Court of the State of New York, Queens County.

There is no need to describe the proceedings before Justice Corrado in any detail at this juncture. The only portion of the trial relevant to the instant habeas petition is the jury selection, which has already been described in Judge Pollak's first report and recommendation in this case, dated February 20, 2003 (the "R&R"). Since familiarity with the R&R is assumed, this Court need not repeat Judge Pollak's description of the voir dire. For purposes of this memorandum and order, it suffices to note that the *Batson* challenge at issue herein took place during the second round of voir dire, following a first round in which the prosecutor had used peremptory challenges against three of the six African-Americans who were among the sixteen prospective jurors. When the prosecutor, ADA Mark Osnowitz, used a peremptory challenge to strike one Jonah Hicks – the only African-American among the sixteen prospective jurors questioned

2

during the second round – petitioner's trial counsel, Michael Fishman, made the *Batson* challenge, alleging that the prosecutor struck Hicks because of his race. After an off-the-record discussion, Justice Corrado permitted Osnowitz to place on the record his reasons for challenging Hicks, and permitted Fishman to make a record as to why the prosecutor's reasons were pretextual. Thereafter, jury selection continued through a third and final round, without Fishman renewing his *Batson* challenge.

The jury, which ultimately included three African-Americans, convicted petitioner of murder in the second degree and criminal possession of a weapon in the second degree. That conviction was affirmed by the Appellate Division, Second Department, which succinctly held "[t]here was no violation of *Batson v. Kentucky* . . . in this case." *People v. Rose*, 251 A.D.2d 604, 604, 673 N.Y.S.2d 940, 940 (2d Dept. 1998). After the New York Court of Appeals denied petitioner leave to appeal the matter further, *People v. Rose*, 92 N.Y.2d 930, 680 N.Y.S.2d 471 (1998) and 92 N.Y.2d 985, 683 N.Y.S.2d 766 (1998), petitioner filed the instant petition, raising solely the *Batson* issue.

By order dated June 24, 2002, the Honorable Sterling Johnson, Jr., referred this petition to Judge Pollak for a report and recommendation. In February 2003, Judge Pollak issued her R&R. The R&R contained a description of the three-step process for evaluating *Batson* claims, in which the moving party must first make a *prima facie* showing that the adversary exercised peremptory challenges based on a prohibited factor, such as race. If the movant makes this showing, the burden shifts to the adversary to provide race-neutral reasons for the peremptory challenges. After the movant is given the opportunity to explain why these reasons are pretextual, the trial court must determine whether the moving party has proved by a preponderance of the evidence that the race-neutral reasons are a pretext for discrimination. *See*

3

*Rose v. Senkowski*, No. 99 CV 6053 (SJ), 2003 WL 21698240, at *9 (E.D.N.Y. July 8, 2003) (citing *Batson*, 476 U.S. at 96-98; *Hernandez v. New York*, 500 U.S. 352, 358-59, 363-64 (1991)).

While Judge Pollak construed the trial record as suggesting that Justice Corrado had "refused to consider the *Batson* challenge to Mr. Hicks because she perceived that there was no adequate *prima facie* showing," she found that Justice Corrado "never made an explicit ruling on the record regarding the *prima facie* showing, instead requesting a facially neutral explanation from the prosecutor." *Id.* at *12. Citing *Hernandez* for the proposition that "any inadequacy in the prima facie showing became moot" once the prosecutor offered race-neutral reasons, and finding that the pattern of strikes against African-Americans was sufficient to make the required *prima facie* showing, Judge Pollak held that Justice Corrado should have proceeded to the third step of the *Batson* analysis and determined if these race-neutral reasons were pretextual. *Id.* Judge Pollak therefore recommended that a reconstruction hearing "be held in an attempt to make a full and fair determination of the prosecution's and the court's intent." *Id.* at *15. The magistrate judge further recommended that the hearing be held before this Court, in case Justice Corrado was called as a witness, and that the petition for a writ of habeas corpus be granted if the reconstruction proved impossible. *Id.*

Petitioner filed no objections to the R&R. Although respondents objected to the R&R on several grounds, Judge Johnson found no merit in these objections and adopted the R&R in its entirety. *Id.* Although Judge Johnson expressed some skepticism as to whether reconstruction would be possible, he referred the case to Judge Pollak for the recommended reconstruction hearing.

<u>The Reconstruction Hearing</u>

The reconstruction hearing was held on February 26, 2004. Prior to the start of testimony, both the prosecution and defense counsel informed Judge Pollak that they had elected not to call Justice Corrado as a witness. The parties agreed that "the state court judge did not make an overall credibility finding at step 3" of the *Batson* analysis and agreed to have Judge Pollak "make de novo a step 3 determination" (H. 4).[1] Defense counsel implied that Justice Corrado's testimony was unnecessary because "the case would rise and fall with the Court's evaluation of the proffered reasons" (H. 4).

The sole witness at the reconstruction hearing, therefore, was Assistant District Attorney Mark Osnowitz, who had been a trial attorney in the District Attorney's Homicide Trial Division at the time of petitioner's trial, but was Deputy Chief of the District Attorney's Supreme Court Trial Division at the time of the reconstruction hearing (H. 5-6). Osnowitz testified that, at the start of trial, the prosecution theory was that petitioner, upon observing his mother's injuries, searched for Scurlock with a friend, confronted the armed Scurlock outside petitioner's own home, disarmed and shot him in revenge for beating petitioner's mother (H. 9). However, Osnowitz believed that petitioner made "a sympathetic defendant" (H. 8) and, consistent with that belief, had offered petitioner favorable plea bargains (H. 8, 68-69).

Osnowitz explained in detail his reasons for fearing that jurors might sympathize with petitioner. First, Osnowitz recognized that petitioner's actions could be viewed as those of a dutiful son defending his mother from a chronically abusive lover (H. 8). Second, Osnowitz

---

[1]Numbers preceded by "H" refer to pages in the transcript of the February 26, 2004, reconstruction hearing.

noted that petitioner was "quite different" from the typical criminal defendant (H. 6); he had no

prior criminal record, had a history of military service, and claimed to have been an excellent

high school student who had taken classes at Yale and Fordham Universities and performed at

Avery Fisher Hall (H. 11). Although Osnowitz had evidence to show that petitioner had been

dishonorably separated from the military, had never applied to Fordham and had not done as well

in high school as he had claimed (H. 11), Osnowitz not only conceded that petitioner was

"gifted" with computers, but was aware of a *Newsday* article "depicting [petitioner] as an

individual who built a robotic arm" (H. 13, 19). Moreover, Osnowitz himself observed that

petitioner was "a good-looking young man," who "presented himself well," was "not . . . stupid,"

and was accompanied by "his mother and other family members in court" (H. 13, 18).

"[C]oncerned that jurors might . . . admire [petitioner's] accomplishments, based upon

what he disclosed about himself on direct examination" (H. 18), Osnowitz wanted jurors who

would critically analyze petitioner's claims and who "would not be sympathetic to this young

man" (H. 15). As Osnowitz put it:

> I knew he [petitioner] was going to testify and I knew he was going
> to try to come across as a forthright person, and I really wanted
> jurors that I thought would be able to analyze this guy and see
> through what he was seeing [sic], look at his demeanor. So, I was
> looking for a more intellectual-type jury on this particular case, and
> jurors that I thought would . . . look at the evidence from our
> standpoint and follow the judge's instructions on the law . . . .
> 
>         *       *       *
> 
> I was hoping to have jurors that had a more formal education or
> that had children that had a more formal education. I was not
> looking for jurors that were similarly situated to the facts of the
> case. I wanted jurors that had a higher degree of intellect, that
> would be able to really follow the instructions on the law in this
> case and look past the sympathetic characteristics that Mr. Rose
> was going to portray (H. 15-16).

6

Aside from intelligence and a lack of sympathy for petitioner, there were several other qualities which Osnowitz sought in a juror. Ideally, he wanted jurors who would "have some type of understanding of the background of the victim" and "wouldn't just be turned off by the victim because there was [sic] domestic issues and there was alcohol involved" (H. 16). Because Osnowitz anticipated that petitioner would "portray himself as a military individual" (H. 23), he wanted jurors who had "worked hard in the military" and would be able to understand the meaning of a dishonorable separation (H. 24). In addition, Osnowitz favored jurors who had previously served on a jury (H. 15), had a law enforcement background or "law enforcement ties" (H. 15, 26), had been a victim of a crime (H. 26) or were longtime property owners (H. 113).

Osnowitz emphasized that there was "no such thing as a perfect juror" (H. 113). He testified that he thought it "unfair to highlight any one variable" (H. 72), and described the process of selecting a juror as "a balancing test" (H. 113). Osnowitz stated:

> I'm balancing the other variables between jurors, such as do they have a law enforcement connection, do they have roots in the community, are they victims of a crime, what is their intelligence, do they have an affiliation with the victim; are they going to just look at this case and say, I'm not going to buy it? (H. 113).

Using these variables, Osnowitz explained his rationale for failing to challenge the 12 jurors and two alternates who were ultimately seated in the case. Osnowitz then explained why he struck the 10 jurors – including four African-American jurors – against whom he had exercised peremptory challenges. During the course of his testimony, Osnowitz referred to a set of juror questionnaires, some of which he had annotated during the voir dire itself, and all of which were introduced into evidence.

There is no need to describe all of Osnowitz's testimony, which Judge Pollak has already summarized in painstaking detail in the Supplemental R&R. However, since petitioner

subsequently identified the issue before Judge Pollak as whether the prosecutor had any race-neutral, non-pretextual reasons for striking Jonah Hicks, this Court will briefly summarize the evidence relating to this prospective juror.

According to his juror questionnaire, Hicks was a high school graduate who worked as a "parking lot supervisor," was married to an X-ray technician, had three children – aged 28, 26 and 22 – and had lived for the past 21 years in South Ozone Park, Queens. One of the children was a security guard; the others were students. Hicks had never been the victim of a crime and had no ties to law enforcement, but had previously served as a juror in a tort case which had settled prior to verdict.

Osnowitz testified that his "overriding" reason for striking Hicks was because he believed Hicks had two sons in school, one of whom was 22 – about the same age as petitioner (H. 58-59). Osnowitz was concerned that Hicks might "feel . . . some sense of allegiance" to petitioner (H. 59), or that Hicks' children might have "a close affiliation" with petitioner (H. 58). On cross-examination, defense counsel alerted Osnowitz to the fact that Hicks' juror questionnaire afforded no basis for believing that any of Hicks' children were male (H. 75). However, Osnowitz's claim that he was genuinely concerned about Hicks' 22-year-old child was substantiated by the fact that Osnowitz had circled that child's age on the juror questionnaire during the voir dire (H. 57).

Although concerns that Hicks would have sympathy for petitioner may have been the "overriding" reason for striking Hicks, Osnowitz suggested that his concerns about petitioner's intelligence were also a substantial factor. Osnowitz testified that he believed Hicks was "simple" and not "well-educated" (H. 57). Osnowitz based that belief not only on his assumption that Hicks' job was not intellectually challenging (H. 79-80) and Hicks' statement

8

that he only read the Sunday newspaper (H. 57), but also on the manner in which Hicks answered

Osnowitz's questions. Osnowitz specifically referred to those portions of the trial transcript in

which Hicks had asked him to repeat a question which another prospective juror had been able to

answer, and had answered, "Yes," to a question asking him to choose between two alternatives

(H. 57-58). Again, Osnowitz's claim that he was truly concerned about Hicks' intellect was

substantiated by the fact that Osnowitz wrote the word "simple" on Hicks' jury questionnaire

during the voir dire (H. 57).

Osnowitz offered several other reasons for striking Hicks. He noted that Hicks had no

ties to law enforcement, and had never been a victim of, or a witness to, a crime (H. 56-57).

While Hicks had served on a civil jury, the case had settled and he had never deliberated (H. 57).

Although Osnowitz admitted that Hicks exhibited some positive characteristics – principally the

fact that he had served in the Marines, owned his own house and had lived there for 21 years (H.

59, 83) – Osnowitz testified that "a combination of all those factors" led him to use a peremptory

challenge against Hicks (T. 59).

Judge Pollak did not entertain oral argument following the close of testimony at the

reconstruction hearing. Rather, she accepted defense counsel's proposal that petitioner provide

written arguments as to why Osnowitz's reasons for striking Hicks were pretextual. Petitioner's

arguments are, therefore, contained in a Post-Hearing Supplemental Brief for Petitioner, filed

April 14, 2004 ("Petitioner's Brief").

Petitioner's Brief defined the sole issue before Judge Pollak as "[w]hether a

preponderance of the evidence establishes that the prosecutor's reasons for challenging

prospective juror Jonah Hicks are pretextual and that Hicks was struck peremptorily on account

of his race." Petitioner's Brief at 3. Petitioner conceded that the reasons the prosecutor had

offered for striking Hicks were "facially race neutral," and that the prosecution had thus

discharged its burden under step two of the *Batson* analysis. *Id.* at 21. However, petitioner

argued that Osnowitz's reasons were not credible. Petitioner argued, *inter alia*, that Osnowitz's

"overriding" reason for striking Hicks – "the fact that he had two sons in school" – was not based

in fact and "strain[ed] credulity," *id.* at 23-24; that there was "no logical basis for the bizarre

notion" that parents of students would be more sympathetic to petitioner than jurors whose

children were not students, *id.* at 24; that Osnowitz lacked a factual basis for believing that Hicks

lacked intellectual capacity, *id.* at 30; and that Osnowitz's failure to ask any questions concerning

Hicks' job showed that the prosecutor was not truly concerned about Hicks' intelligence. *Id.* at

28-29. In addition, citing to language in *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003), in

which the Supreme Court noted that "[s]upport for the notion that there was purposeful

discrimination in the peremptory challenge may lie in the similarity between the characteristics of

jurors struck and jurors accepted," petitioner argued that Hicks not only shared the positive

characteristics of seated jurors – such as a military background and prior jury service – but had

the same negative characteristics – such as a lack of formal education – which Osnowitz had

ignored in selecting other jurors.

The Supplemental Report and Recommendation

On July 25, 2005, Judge Pollak issued her Supplemental R&R, in which she concluded,

based upon "the demeanor and testimony of ADA Osnowitz," that "the prosecutor was

completely credible when he provided his recollection of voir dire and when he asserted that his

decision to strike Mr. Hicks was not racially motivated." Supplemental R&R at 27. The

Supplemental R&R thoroughly recounted the history of the litigation, and described the

10

testimony at the Reconstruction Hearing in great detail. Indeed, the Supplemental R&R not only described Osnowitz rationale for striking Hicks, but recounted his testimony concerning his reasons for accepting or striking many other jurors as well.

In her legal analysis, Judge Pollak considered the factors identified by the Supreme Court in *Miller-El*: (1) the demeanor of the attorney offering the explanation; (2) the reasonableness of the explanation; and (3) whether the explanation has some basis in accepted trial strategy. *Id.* at 25. With respect to the first factor, Judge Pollak found, "based on his demeanor," that Osnowitz was "completely truthful in his testimony." Supplemental R&R at 31. She not only found Osnowitz to be credible, but found "his memory of this case and of the specific jurors, even in light of the passage of time, . . . remarkable." *Id.*

Judge Pollak also found Osnowitz's explanations for his exercise of peremptory challenges to be reasonable. She found that "the prosecutor provided a coherent and credible description of the type of prospective juror he was looking to seat," *id.* at 28, and had selected jurors in a manner consistent with that description. The magistrate judge expressly rejected petitioner's tactic of isolating the individual characteristics identified by Osnowitz, then finding an instance in which Osnowitz struck a prospective juror having such a characteristic, noting that "Osnowitz made it clear that he was relying on a combination of factors in deciding who to strike." *Id.*

Finally, Judge Pollak found Osnowitz's explanations to have a sound strategic basis. She noted that Osnowitz had reason to want well-educated jurors and to fear that jurors might be sympathetic to petitioner, and that he had picked jurors in a manner consistent with this strategy. While she questioned whether some of the other characteristics sought by Osnowitz – such as ties

11

to the community and to law enforcement, experience with the criminal justice system and prior jury service – were accurate predictors of whether a juror would favor the prosecution, Judge Pollak implied that misguided non-pretextual reasons for exercising peremptory challenges did not violate *Batson*, stating, "the only relevant question for this Court to determine is whether the prosecutor's proffered explanation for striking Mr. Hicks is merely a pretext for discrimination." *Id.* at 28.

In conclusion, Judge Pollak found "absolutely no evidence to suggest a racial bias on the part of the prosecutor." *Id.* at 32. Accordingly, she recommended that this Court hold that petitioner failed to carry his burden of establishing that Osnowitz's race-neutral explanations for striking Mr. Hicks were pretextual, and that the instant petition for a writ of habeas corpus be denied.

Petitioner timely objected to the Supplemental R&R by filing a sixteen-page document entitled, "Petitioner's Objections to the Magistrate Judge's Report and Recommendation," and dated September 12, 2005 ("Petitioner's Objections"). Those objections are described in detail in the discussion below.

## DISCUSSION

If any party serves and files written objections to a magistrate judge's report and recommendations within ten days of being served with a copy of thereof, a district court must "make a de novo determination of those portions of the report or . . . recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Upon de novo review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* A court is not required to review the factual or legal conclusions of the magistrate

12

judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

In this case, petitioner raises several objections to Judge Pollak's Supplemental R&R. However, before addressing those objections and conducting the de novo determination contemplated by § 636(b)(1), this Court notes that petitioner is in agreement with the Supplemental R&R in two respects. First, petitioner agrees that Judge Pollak correctly identified the question before her as "whether the race-neutral reasons offered by the prosecutor [for striking Hicks] were actually a pretext for discrimination." Petitioner's Objections at 3. Second, petitioner concedes that the magistrate judge "correctly identified [the] general standard" to be applied in deciding the question by considering the factors identified by the Supreme Court in *Miller-El. Id.* at 4.

Although petitioner concedes that Judge Pollak identified the correct standard, petitioner nonetheless objects to the manner in which Judge Pollak applied the standard. First, petitioner implies that Judge Pollak based her decision largely on "the fact that the prosecutor did not strike 'an overly large number of potential African-American jurors' and that a number of African-Americans served on the petit jury." *Id.* at 5. Petitioner notes that "the striking of even a single juror based on race violates the constitution," *id.* (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998)), and that Judge Pollak was incorrect in stating that the fact that several African-Americans ultimately served on the jury was the "most important" factor in deciding that no *Batson* violation occurred.

It is true that, at the very end of the Supplemental R&R, Judge Pollak states, "Perhaps most importantly, looking at the panel selection process as a whole, the prosecutor did not strike

13

an overly large number of potential African-American jurors and selected at least four . . .

African-American jurors who possessed the characteristics that he was looking for in a potential

juror." Supplemental R&R at 32. However, despite this language, Judge Pollak's ruling was not

based solely, or even largely, on the fact that some African-American jurors were ultimately

seated. In the 31½ pages preceding this single sentence, Judge Pollak engaged in a painstakingly

thorough review of the reasons Osnowitz gave for striking Hicks. After considering the factors

identified in *Miller-El*, Judge Pollak concluded that petitioner had failed to carry his burden of

establishing that Osnowitz's race-neutral explanations for striking Hicks were pretextual. Thus,

Judge Pollak's recommendation that petitioner's *Batson* challenge be rejected does not appear to

have been based on the fact that the prosecutor ultimately seated some African-American jurors,

but was correctly based on her careful evaluation of the credibility of the race-neutral reasons

proffered by the prosecutor.

Indeed, petitioner's second objection implicitly concedes that Judge Pollak engaged in

this evaluation, but argues that she refused "to give credence to the voluminous evidence that the

prosecutor's reasons for challenging Hicks were not applied to other [prospective jurors]."

Petitioner's Objections at 5. Petitioner cites to that portion of the Supplemental R&R in which

Judge Pollak states:

> To the extent that petitioner has isolated the individual factors cited
> by ADA Osnowitz and identified another prospective juror who the
> prosecutor struck even though that juror had one of these
> characteristics, the Court notes that ADA Osnowitz made it clear
> that he was relying on a combination of factors in deciding who to
> strike.

Supplemental R&R at 28. Petitioner then argues that the Supreme Court "recently rejected this

14

mode of pretext analysis" in *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317 (2005) ("*Miller-El II*"), by stating:

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. * * * A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable . . . .

*Id.*, 125 S.Ct. at 2329, n. 6.

This footnote stands for the proposition that, in order to prove that an African-American venireperson was struck for racial reasons, a party advancing a *Batson* claim need not be able to point to an identical non-African-American who was seated as a juror. Obviously, such a requirement would render it impossible to obtain *Batson* relief in most instances because, as the Supreme Court put it, "potential jurors are not products of a set of cookie cutters." *Id.* However, it would be equally absurd to permit a defendant to make out a *Batson* claim by simply showing that the struck African-American venireperson shared some characteristic with non-African-American jurors who were actually seated. While evidence that "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve" tends to prove purposeful discrimination, *id.*, 125 S.Ct. at 2325, the prosecution can rebut that evidence by showing that the prosecutor had other non-discriminatory reasons for striking the juror which did not also apply to the empaneled juror. Therefore, this Court does not agree that footnote 6 in *Miller-El II* precluded Judge Pollak from considering the "combination of factors" which related to Osnowitz's decisionmaking.

After evaluating the factors which Osnowitz identified, Judge Pollak credited Osnowitz's explanation for exercising a peremptory challenge against Hicks. Specifically, she credited

15

Osnowitz's claim that he was concerned that Hicks, as the father of two students, might be sympathetic to petitioner and might not be intelligent enough to critically examine petitioner's testimony. Petitioner objects to this determination for several reasons. First, petitioner challenges Osnowitz's claim that he excluded Hicks and other parents of students in their teens and twenties because he thought these individuals might be sympathetic to petitioner. Second, he argues that Justice Corrado rejected Osnowitz claim that he struck Hicks because of concerns about Hicks' intelligence, and asserts that Justice Corrado's determination should be entitled to great weight. Third, he argues that Judge Pollak failed to give adequate weight to Hicks' military experience and other factors which Osnowitz claimed to be looking for in a juror.

The Sympathy Factor

Petitioner advances several arguments for finding that Osnowitz's "overriding" reason for striking Hicks – namely, that he feared Hicks, who had children about the same age as petitioner, might sympathize with petitioner – was pretextual. First, petitioner argues that Osnowitz mischaracterized the record concerning Hicks' children, and that such mischaracterization can be evidence that a reason is pretextual. Second, petitioner asserts that Osnowitz's failure to engage in any voir dire concerning Hicks' children suggests that Osnowitz's explanation was a sham. Third, petitioner notes that, contrary to Judge Pollak's finding, several seated jurors had children petitioner's age, who either were or may have been enrolled in school at the time of jury selection. Finally, petitioner implies that Osnowitz's assertion that Hicks might have felt any allegiance to petitioner because his own son was a security guard is so strained and nonsensical as to cast doubt on the veracity of Osnowitz's other reasons for striking Hicks.

Petitioner's first argument relates to Osnowitz's statements – both immediately after the *Batson* challenge and during the reconstruction hearing – that Hicks had two "sons" who were

16

students. Noting that the record contained no evidence as to the sex of Hicks' children, petitioner casts these statements as deliberate mischaracterizations and cites *Miller-El II* for the proposition that such mischaracterizations can be evidence that a reason for striking a juror was pretextual. Petitioner's Objections at 6.

While *Miller-El II* noted that a deliberate mischaracterization of facts could provide a reason to question whether such facts were truly a reason for striking a juror, the mischaracterization in *Miller-El II* was far more serious than the alleged mischaracterizations in this case. In *Miller-El II*, which involved a *Batson* challenge during the penalty phase of a capital case, the prosecutor represented that he had exercised a peremptory challenge because the prospective juror had said he would not vote for death if rehabilitation was possible. In fact, the juror had said just the opposite. The Supreme Court discounted the possibility that the prosecutor had merely misunderstood what the prospective juror had said, opining that the prosecutor would have proceeded differently if he had. *Id.*, 125 S.Ct. at 2327.

In comparison to the mischaracterizations by the prosecutor in *Miller-El II*, Osnowitz's misstatements concerning Hicks' responses were relatively minor. While petitioner correctly notes that there does not appear to have been any evidence concerning the sex of Hicks' children, Hicks' juror questionnaire indicates that two of the children were students and that all three children were in their twenties. The prosecutor's fears that Hicks might sympathize with petitioner because he had children the same age would not have been significantly diminished had Hicks' student children been female. Moreover, the fact that Osnowitz circled the youngest child's age on the juror questionnaire prior to challenging Hicks suggests that Osnowitz was more concerned about the child's age than the child's sex.

17

Moreover, Osnowitz's alleged mischaracterization does not appear to have been deliberate. Osnowitz first stated that the students were "sons" in his verbal response to petitioner's *Batson* challenge. Petitioner's trial counsel did not contradict him. At the reconstruction hearing, Osnowitz testified in a manner consistent with his prior representations, until defense counsel pointed out on cross examination that Osnowitz had erred in assuming the three children mentioned in the juror questionnaire were male. It seems unlikely that Osnowitz, a career prosecutor, would have deliberately misrepresented the record under oath, especially when the misrepresentation related to a relatively minor point. Rather, it seems far more likely that Osnowitz erroneously assumed that Hicks' children were male, and that Osnowitz genuinely believed the students were "sons" at the time he made his decision to challenge Hicks. If Osnowitz's misstatements were in fact the result of inadvertent errors, they were not deliberate mischaracterizations of the sort in *Miller-El II* and cannot be considered evidence that the reason to which the misstatements related was pretextual.

Petitioner's second argument – that Osnowitz failed to conduct a voir dire concerning Hicks' children – is also unpersuasive. First, as noted above, Osnowitz appears to have either misread the juror questionnaire as stating that Hicks had two sons, or to have found Hicks' children's ages alone to create a possibility that Hicks might be sympathetic. In addition, Osnowitz doubted Hicks' intelligence, based both on his job – which Osnowitz characterized as "simple" – and on the manner in which he answered Osnowitz's questions. Since Osnowitz already had several reasons not to want Hicks as a juror, there was no reason for Osnowitz to use his limited voir dire to question Hicks further. Although a lawyer's failure to seek clarification of ambiguities in a juror questionnaire might seem suspicious under other circumstances, there

was nothing suspicious about Osnowitz's decision not to ask Hicks questions about his family under the circumstances of this case.

Second, this Court notes that Osnowitz generally avoided asking jurors questions about their individual histories. Unlike petitioner's trial counsel, who questioned each juror separately about his or her responses to the juror questionnaire, Osnowitz preferred to question the jurors about broader topics. Such topics included, *inter alia*, the jurors' abilities to keep their eyes "on the ball," *see, e.g.*, T. 159, 251, and their possible sympathy for petitioner. *See, e.g.*, T. 167, 248.[2]

Indeed, while Osnowitz never asked Hicks questions about his children or his job, the genuineness of Osnowitz's concern that the second-round prospective jurors might harbor sympathy for petitioner was readily apparent. He not only asked the prospective jurors whether they thought a person's background was relevant in determining whether the person was telling the truth or had committed a crime, but questioned the prospective jurors directly concerning their possible sympathy for petitioner:

> He's a young man sitting there, 21 years old. Can you all promise
> me you will not let sympathy because of his age or anything that
> does not bear on the evidence that you hear from this witness
> stand, can you promise me nothing else matters except what you
> hear from that witness stand? Does everybody realize that? (T.
> 167).

In light of this line of questioning, the fact that Osnowitz did not ask Hicks for details concerning the sex of his children does not imply that Osnowitz was not legitimately concerned that Hicks might harbor sympathy for petitioner.

---

[2]Numbers preceded by "T" refer to pages in the trial transcript.

Petitioner's third argument – that the prosecution did not strike several jurors who had children who were petitioner's age – is also unpersuasive in that it largely ignores factors which made the jurors attractive to the prosecution. Petitioner correctly states that the first seated juror, Lorraine Polanco, had a 22-year-old daughter who attended nursing school, but ignores the fact that her other child was an ex-Marine and a New York City Police Officer. In addition, Polanco had once prosecuted individuals who "jumped" her son on his way home from school, suggesting that she was the sort of law-and-order juror who might be sympathetic to prosecution.

Petitioner is also correct in noting that Marie Nachtigal, whom the prosecution did not challenge in the third round, had three children, aged 20 to 25, some or all of whom were students. However, Osnowitz testified at the reconstruction hearing that he did not challenge Nachtigal because her husband, like Scurlock, worked for the New York City Transit Authority and Osnowitz believed this similarity would cause her to identify with the victim (H. 121-22). Petitioner also ignores the fact that Nachtigal had prior experience on a criminal jury that reached a verdict, and was challenged by defense counsel, who presumably also thought she might favor the prosecution.

Similarly, Paul Parker, the eighth juror seated, had three children aged 22, 18 and 15. However, Parker, a college graduate who described himself as "Executive Director" of a trade association, was unlikely to make an emotional decision based on sympathy. Moreover, the fact that Parker's eldest child was similar to petitioner – 22 years old and involved with computers – was attractive to Osnowitz in two respects. First, Osnowitz hoped that Parker might have the technical knowledge to question petitioner's claim of computer expertise. Second, he hoped that Parker would be inclined to judge petitioner harshly if he concluded that petitioner was exaggerating that expertise. As Osnowitz explained:

> [T]here was an allegation that he [petitioner] was going to basically
> state that he was involved with computers and robotics, and I
> wanted someone who had a son who had a degree in that . . . . I
> thought his son worked hard for that degree, whereas Robert Rose
> didn't. I thought he might . . . look a little bit more harshly to what
> Robert Rose says . . . . (H. 47).

John Antista, whom the prosecution did not challenge in the second round, also had a child about the same age as petitioner. However, there were good reasons to doubt that Antista would be swayed by sympathy for petitioner. Antista was not only college-educated in computer science and employed as a data processing manager in a large hospital, but also told defense counsel that he "liked" Howard Beach (T. 172), a neighborhood notorious for its less than sympathetic views of African-Americans. In light of this testimony, it was hardly surprising that it was defense counsel, not the prosecutor, who exercised a peremptory challenge against Antista.

Finally, petitioner is correct in noting that Barbara John, the third juror seated in this case, had a 27-year-old child. However, the fact that Osnowitz seated this juror while striking Hicks undercuts petitioner's claim of racial discrimination because both Hicks and John were African-Americans.

Petitioner's fourth argument involves Osnowitz's claim that he thought Hicks might be sympathetic to petitioner because Hicks' son was a security guard. After testifying concerning his other reasons for striking Hicks, Osnowitz stated:

> Just one other factor. He [Hicks] indicated that his son was a
> security guard, and in this case, you had Robert Rose coming,
> potentially, to the aid of his mother, at the house. A son being a
> security guard, who may have come to a position of having to
> protect property, and that coupled with the other two sons being
> students – I thought he had too much closeness to the background
> of what was going to develop at the trial. (H. 60).

21

This Court, like petitioner, finds it difficult to comprehend this alleged reason for fearing Hicks would be sympathetic to petitioner. However, petitioner does not allege that Judge Pollak credited this reason. Rather, petitioner appears to suggest that Judge Pollak should have employed something akin to "falsus in uno" analysis, implying that because "[t]his supposed rationale [was] . . . painfully strained on its face," the rest of Osnowitz's reasons were also contrived. Petitioner's Objections at 10.

This Court does not find that Judge Pollak erred in failing to employ this sort of analysis. First, the fact that neither this Court nor petitioner's counsel comprehends the logic of Osnowitz's final reason for striking Hicks does not compel the conclusion that Osnowitz fabricated this reason. Second, even if this reason was fabricated, Judge Pollak was not compelled to reject Osnowitz's other reasons. Judge Pollak was aware of petitioner's "falsus in uno"-type argument, which he made in his post-hearing brief as well as in the instant objection. *See* Supplemental R&R at 26-27. Yet, Judge Pollak apparently rejected this argument, and credited Osnowitz's other race-neutral reasons for striking Hicks. Since Judge Pollak, who heard Osnowitz testify at the reconstruction hearing, is in a better position than this Court to assess his credibility, this Court is not persuaded by petitioner's fourth argument.

The Intelligence Factor

Petitioner also advances two objections relating to Judge Pollak's finding that Osnowitz's concerns about Hicks' intelligence were a non-pretextual reason for striking Hicks. The first of these objections – based on Osnowitz's assumption that Hicks had been a parking lot supervisor his "entire life" and Osnowitz's failure to question Hicks regarding the duties of his employment – is similar to petitioner's first and second objections to the sympathy factor. In his initial, oral

22

response to petitioner's *Batson* challenge, Osnowitz appears to have assumed, based on the fact that Hicks listed his occupation as a supervisor, that Hicks had worked in the parking lot for a long time. He further assumed, based solely on the job title, that Hicks' position did not require much intelligence. However, there is nothing to suggest that Osnowitz, like the prosecutor in *Miller-El II*, was intentionally mischaracterizing the record. Moreover, while further questioning might possibly have adduced evidence to undercut these assumptions, Osnowitz – with limited time to voir dire – elected to pursue other topics. There was nothing suspicious or inappropriate about this decision. After Hicks essentially confirmed Osnowitz's suspicions concerning his intelligence by failing to understand a question which another juror had just answered and answering, "Yes," to a question offering him a choice of two alternatives, Osnowitz's decision not to waste further time questioning Hicks about his job was entirely reasonable.

The second of these objections – that Justice Corrado's rejected Osnowitz's claim that he struck Hicks because of concerns about Hicks' intelligence and that Justice Corrado's determination should be accorded great weight – is also not well taken. First, this Court concurs with Judge Pollak's conclusion that Justice Corrado never rejected Osnowitz claim that he struck Hicks because of Hicks' perceived intellectual limitations. After Osnowitz responded to the *Batson* challenge by explaining his reasons for striking Hicks, Justice Corrado attempted to clarify the prosecutor's arguments by stating:

> As far as his intellect is concerned, I don't think you're really basing your objection on that, mostly that he might be sympathetic is that it? (T. 215).[3]

---

[3]Justice Corrado's subsequent statement, "I said he was wrong in saying that, counselor" (T. 215), is ambiguous. Although Fishman apparently thought Justice Corrado was referring to Osnowitz's comments regarding petitioner's intelligence, Justice Corrado never clarified in what respect she believed Osnowitz had been "wrong."

However, Justice Corrado consistently stated that she was only permitting the parties to make their record, and was therefore not ruling on the bona fides of the reasons proffered by the prosecution.

Even if Justice Corrado's statement could be construed as rejecting intelligence as a reason for striking Hicks, that determination would not be controlling upon this Court. As petitioner himself argues, because Judge Johnson found that "the state courts in petitioner's case . . . never resolved the pretext issue," both Judge Pollak and this Court "must address that claim without according deference" to the State court. Petitioner's Objections at 4. Accordingly, Judge Pollak, who explored Osnowitz's reasons for striking Hicks in far greater depth than Justice Corrado, was free to disregard whatever credibility assessments Justice Corrado may have made.

Other Factors

Petitioner also objects on the ground that Judge Pollak ignored other factors which suggested that Hicks would be astute enough to serve on the jury. Specifically, petitioner faults Judge Pollak for failing to take into account that Hicks had prior military service and, by virtue of having a wife who was an X-ray technician, would be able "to evaluate any forensic evidence relating to the autopsy." Petitioner's Objections at 13.

While Osnowitz testified that Hicks' military service was "a positive variable," he also testified that this variable was outweighed by negative factors (H. 83). Judge Pollak credited Osnowitz's testimony in its entirety, and petitioner has not suggested any reason to doubt the veracity of this particular statement. In fact, in arguing that Judge Pollak failed to give Hicks' military service sufficient "weight," petitioner suggests that he is not really contesting Judge

24

Pollak's credibility determination, but rather Osnowitz's decision that this variable was outweighed by other, negative factors.

Osnowitz did not testify that medical expertise was among the characteristics he sought in a juror. This is not surprising, since petitioner admitted shooting Scurlock and his cause of death was not expected to be an issue in the case. Moreover, there is nothing to suggest that Hicks had acquired any particular medical expertise by virtue of his marriage to an X-ray technician. Accordingly, Judge Pollak was entirely justified in not according any weight to this factor.

Petitioner's final objection is based on that portion of the Supplemental R&R in which Judge Pollak stated:

> The prosecutor testified that he believed students or parents with children who were students would be more likely to sympathize with petitioner and would be more likely to accept his claims regarding his academic achievements. The fact that petitioner's counsel or even this Court might disagree with the prosecutor's view is irrelevant to this inquiry.

Supplemental R&R at 32. Citing to caselaw which holds that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination," *Purkett v. Elem*, 514 U.S. 765, 768 (1995), petitioner argues that the magistrate judge's conclusion that the prosecutor's reason was based on "facially dubious logic" was not "irrelevant." Petitioner's Objections at 8-9.

This objection misinterprets the thrust of Judge Pollak's statement. That statement did not imply that Osnowitz's justifications for striking Hicks were implausible or fantastic. To the contrary, Judge Pollak expressly found that Osnowitz was entirely rational in seeking to choose "jurors who would sympathize with or feel a connection to the victim" and in attempting to strike prospective jurors "who might sympathize with the petitioner." Supplemental R&R at 31-32. In

25

making the statement quoted above, and in making similar statements in the R&R, Judge Pollak

was simply acknowledging the fundamentally subjective nature of jury selection, noting that not

all litigators would agree on the juror characteristics which would be predicative of sympathy to

petitioner or to the victim. However, Judge Pollak credited Osnowitz's testimony that he

genuinely believed that students or parents with children who were students would be more likely

to sympathize with petitioner. Judge Pollak – who cited *Purkett* in her R&R – did not believe

that these factors were implausible or fantastic; otherwise, she would not have held that

Osnowitz's reasons were non-pretextual.

## CONCLUSION

For the reasons stated above, this Court fully concurs with Judge Pollak's conclusion that

petitioner has not sustained his burden of proving by a preponderance of the evidence that the

prosecutor's race-neutral reasons for striking Hicks were pretextual. Having considered

petitioner's objections and having reviewed de novo those portions of the Supplemental Report

and Recommendation, dated July 25, 2005, to which the objections relate, this Court hereby

accepts Judge Pollak's thorough Supplemental Report and Recommendation in its entirety. The

instant petition for a writ of habeas corpus is, accordingly, denied.

**SO ORDERED.**

SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
June 2/, 2006